## HEYSE v MICHALSKE, Admr., et

Probate Court, Cuyahoga Co.

### No. 278104

Alexander Mintz, Cleveland, for plaintiff.

Calhoun, McLeod & Fricke, Cleveland and C. D. Marsh, Cleveland, for defendant.

## OPINION

By BREWER, J.

This case is presented to the Court on the petition for a declaratory judgment filed by Albert E. Heyse, administrator of the estate of his father, Ednest F. Heyse, deceased.

Defendants are: the administrator of the estate of Louisa Heyse, deceased, the alleged widow of Ernest F. Heyse, deceased, and the unknown heirs of Louisa Heyse, deceased.

Ernest F. Heyse married Louise Heyse in the City of Cleveland on the 18th day of February, 1904, the license to marry having been obtained from this Court. In applying for the license, Louisa Heyse represented her mother's maiden name to be "Theresa Hazel". It was, in fact, Theresa Heyse.

Louise Heyse's mother and Ernest F. Heyse, the man whom she married, were brother and sister.

Ernest F. Heyse died on the 12th day of December, 1938, leaving Louisa Heyse, his alleged widow, and a son by a prior marriage, whose name is Albert E.

Heyse, and the plaintiff in this action. Louisa Heyse died on the second day of August, 1939.

The questions before the Court are:

Is the marriage between Ernest F. Heyse and Louisa Heyse void or voidable, and can the marriage be attacked after the death of Ernest F. Heyse and Louisa Heyse?

The Statutes of Ohio relating to the subject are:

"Sec. 11181: Who may Contract Matrimony. Male persons of the age of eighteen years, and female persons of the age of sixteen years not nearer of kin than second cousins and not having a husband or wife living, may be joined in marriage. Any such person under the age of twenty-one years must first obtain the consent of his or her parents, surviving parent or guardian, except that where one parent has abandoned such minor or resides in a foreign country, the consent of the other parent shall be sufficient."

"Sec. 13023: Incest. Whoever, being nearer of kin by consanguinity or affinity than cousins, having knowledge of such relationship, commit adultery or fornication together, shall be imprisoned in the penitentiary not less than one year nor more than ten years."

In order to properly construe these statutes and their effect upon this alleged marriage, it is appropriate to trace the development of our marriage laws. In early times in England the institution of marriage was completely controlled by the Church. It fixed the abilities and disabilities, and ecclesiastical courts of the Church determined all questions arising out of the marriage. It was the ecclesiastical or canonical law on any disabilities which might exist on the part of parties to a marriage which made the marriage voidable only. Application could be made to ecclesiastical courts of the Church to either remedy the disability or to void the marriage, as the case might be.

There was no such thing under the canonical law as a marriage being void ab initio. Considerable complaint de-

veloped in England against Church control over marriages, because of the great number of disabilities that had been created and the confusion and litigation that resulted. Commencing with the reign of Henry VIII the State gradually took possession over the subject of marriage which resulted in classic distinction being made between canonical disabilities on the one hand and civil disabilities on the other. Canonical disabilities rendered the marriage voidable and civil disabilities rendered the marriage void.

An excellent review of the foregoing subject matter is found in Lawyers' Reports Ann. 1916, at page 690.

In the case of **Heath v Heath, 25 O. N. P. (N.S.) 123,** an incompetent by virtue of lunacy was a party to an alleged marriage. On page 124 the Court said * * * "Mental incapacity rendering a party incapable of consent renders his contract void ab initio, and the Court will so declare at the suit of the guardian to charge such contract a nullity."

In **Schafer v State of Ohio, 20 Ohio, Page 1,** the Court said in the Syllabus:

"Marriage in this State, contracted by persons under the age of eighteen, and female persons under fourteen, are invalid unless confirmed by cohabitation after arriving at those ages respectively * * * Such a marriage not thus confirmed does not subject the party to punishment for bigamy for contracting a subsequent marriage while the first husband or wife is living."

Judge Ranney in his opinion on page 5 quotes Blackstone as follows:

"These civil disabilities make the contract void ab initio and not merely voidable, not that they dissolve a contract already formed, but they render the parties incapable of forming any contract at all; they do not put asunder those who are joined together, but they previously hinder the junction. And if any persons under these legal inca-

pabilities come together, it is a meretricious and not a matrimonial union."

In Ohio by virtue of §11181, marriage within a forbidden degree of consanguinity is equally a civil disability.

In State v Brown, 47 Oh St, an uncle married his niece. The uncle was indicted for fornication and adultery under the incest statute, which was then known as §7019, Revised Statutes, reading as follows:

"Persons nearer of kin by consanguinity or affinity than cousins having knowledge of their relationship, who commit adultery or fornication together, shall be imprisoned * * *".

The case proceeded on two counts, the second which alleged the parties to be married and guilty of fornication, and the fifth alleging them to be married and the act called adultery. The defendant's motion for a directed verdict was granted, the grounds for the motion being that the indictment did not charge an offense. The question then went to the Supreme Court, and on page 108 of its opinion the Court said:

"The only question necessary to be determined in connection with this count that has not been decided in passing upon the sufficiency of the second count, is the necessity of the count negativing the marriage of the defendant and Rose Cramer."

And on page 109 the Court said:

"We hold, therefore, that by §7019, Revised Statutes, sexual commerce as between persons nearer of kin than cousins is prohibited whether they have gone through the form of intermarriage or not, nor is it material that the marriage was celebrated in a country where it was valid, for we are not bound upon principles of comity to permit persons to violate our criminal law adopted in the interest of decency and good morals, and based on principles of sound public policy, because they have assumed in another state or country, where it was lawful, the relationship which led to the acts prohibited by our laws."

In Volume 9, Cincinnati Law Review, page 82, appears the following statement:

"Sec. 132. A marriage which is against the law of the State of domicile of either party, though the requirements of the law of the State of celebration have been complied with, will be invalid everywhere in the following cases:

"(a) A polygamus marriage;

(b) Incestuous marriage between persons so closely related that their marriage is contrary to the strong public policy of the domicile;

(c) Marriage between persons of different races where such marriages are at the domicile regarded as odius;

(d) Marriage of a domiciliary which a statute at the domicile makes void even though celebrated in another State."

Annotation: In State v Brown, 47 Oh St 102, the Court held that an uncle and niece would be guilty of fornication under §13023 GC even if they were married in a country where such a marriage was valid.

Apparently, the Court felt that whether the parties were domiciled in or out of Ohio at the time of their marriage was immaterial.

In U. S. v Rogers, 109 P. 886, State v Brown, supra, is again cited.

In this case an uncle married his niece in Russia where the validity of such marriage was recognized. The husband was a naturalized citizen. His wife and son were aliens. The Commissioner of Immigration ordered their deportation.

If the marriage was valid the wife and son would be permitted to remain. The Court held that the marriage was illegal in the United States.

In Arado v Arado, 117 Northwestern, at page 818 the Court said:

"It would be contrary to reason to say that an act which is criminal can be valid for any purpose or that a marriage contracted by a person incapable of entering into the contract can have any validity."

It seems to be the law that a voidable marriage is one in which the defect can be cured by ratification or a confirmation or removal otherwise. of the disability, whereas, a void marriage is one in which the parties have no power under any circumstances to ratify, confirm or otherwise validate the marriage.

In 26 O. Jur., at page 47 is found the following language:

"A marriage may be considered voidable though prohibited by law, when it is possible under any circumstances for the parties to contract the marriage or subsequently to ratify it, while it should be considered void, if it is impossible under the law to contract it or subsequently ratify it, or if the statute expressly declares such marriage void."

It is obvious that the uncle and niece could not ratify or confirm their marriage in Ohio, considering the marriage statute and the incest statute.

In McIlvain v Shibley, 109 Ky. 455, the Court said:

"The chief contention of appellant is that although the marriage in question was prohibited by the laws of Tennessee yet the same was not absolutely void, and this being true, and this marriage not having been adjudged void during the life of the parties, that it must now be construed and held to be a valid marriage * * * It is true that the Tennessee statute does not expressly say that the marriage between uncle and niece was void though it does expressly prohibit such marriage and provides that persons violating the law shall be guilty of felony and confined in the penitentiary for a number of years. Hence, it seems to us that taking the statutes relating to such marriages, the necessary meaning and intent were to render such marriages absolutely void. It would be strange, indeed, if a marriage could have any validity and yet the parties by continuing the marriage relation would be guilty of a felony and constantly liable to be convicted and sent to the penitentiary."

In Osoinach v Watkins, 180 South., 577 Alabama, on page 579 the Court said:

"* * * and so the marriage which the law-making power has declared void in either express terms or by necessary implication shall not be allowed any validity."

Louisa Heyse made a fraudulent representation to this Court when she obtained her license to marry. Had she truthfully stated her mother's maiden name and her relationship to Ernest F. Heyse this Court undoubtedly would have refused to issue a license to marry. She could have been prosecuted and no doubt convicted of committing the crime of incest, yet it is now contended that this Court should enable her heirs to profit by such an act.

The second question is whether a collateral attack can be made upon the marriage after the death of both parties.

If the marriage is merely voidable, it may not now be collaterally attacked. However, a different situation arises if the marriage is void.

In Schouler on Marriage and Divorce, Sixth Edition, page 1357, Sec. 1086, we find this statement:

"One difference between a void marriage and a voidable marriage is that the former may be collaterally attacked after death by heirs. while in the case of a voidable marriage it is open to attack only in the lifetime of both spouses."

In Bishop, Sixth Edition. Marriage, Divorce and Separation, Sec. 105, it states:

"A marriage is termed void when it is good for no legal purpose, and its invalidity may be maintained in any proceeding, in any court, between any parties, whether in the lifetime or after the death of the supposed husband and wife, and whether the question arises directly or collaterally."

There are numerous citations of courts of various states supporting this assertion.

The holding of this Court is in accord with the strong public policy of this State expressed in State v Brown, supra, and this is elaborated upon in Lawyers' Reports, Ann. 1916. See at page 724 the following language:

"From the earliest time, at least in the Christian world, marriages of persons within the closer degrees of relationship have been universally condemned as grossly indecent, immoral, incestuous, and inimical to the purity and happiness of the family and the welfare of future generations. For instance, it has well been said that incestuous marriages 'contravene the voice of nature, degrade the family, and offend decency and morals'; and, as stated by the great jurist, Chancellor Kent: 'The objection to such marriages is undoubtedly founded in reason and nature. It grows out of the institution of families and the rights and duties, habits and affections flowing from that relation, and which may justly be considered as part of the law of our nature as rational and social beings. Marriages among such nearer relations would not only lead to domestic licentiousness but, by blending in one object duties and feelings incompatible with each other, would perplex and confound the duties, habits and affections proceeding from the family state, impair the perception and corrupt the purity of moral taste, and do violence to the moral sentiments of mankind. Indeed, we might infer the sense of mankind and the dictates of reason and nature from the language of horror and detestation in which such incestuous connections have been reprobated

and condemned in all ages.' To summarize, there are three reasons why incestuous marriages should be prohibited, especially those between persons closely related by consanguinity. In the first place, they are abhorent to the nature not only of civilized man, but of barbarous and semi-civilized peoples; and, in the second place, tend to confusion of rights and duties incident to the family relation. In addition, science and experience have established beyond cavil that such intermarriages very often result in deficient and degenerate offspring which, if occurring to any great extent, would amount to a serious deterioration of the race."

This Court has found no Ohio decisions determinative of the questions presented in this case, but has concluded that the marriage between an uncle and niece in the State of Ohio is void ab initio and hence can be collaterally attacked, though both parties to the marriage are dead.

A decree may be drawn in accordance with the Court's findings.